et cetera versus University of Massachusetts May it please the court, my name is Allison Hope Cohen and I am counsel for the appellant and relator Michael Ouellette. Respectfully I would like to reserve five minutes for rebuttal. By the Constitution of Massachusetts it is made the duty of the legislatures and magistrates in all future periods of this commonwealth to encourage private societies and public institutions, rewards and immunities for the promotion of agriculture, arts, sciences, commerce, trades, manufacturers and natural history of the country. And it is declared with equal explicitness that no man nor corporation or association of men have any other title to obtain advantages or particular and exclusive privileges distinct from those of the community than what arises from the consideration of services rendered to the public. Although neither the Constitution nor legislative enactments of the commonwealth afford any definition in terms of the word corporation, the declarations above cited may indicate clearly enough the ordinary force of the term as by them employed from the law of Massachusetts of manual manufacturing corporations by Samuel Batchelder Jr. 1868. Today's case is about defining what a state agency is. May I interrupt you with this question? I don't want you to stop the train of your argument. But may I assume that at some point you're going to get to the question whether there was a false claims act claim even pleaded? Because if there wasn't, I take it we don't have to decide this question of the arm of the state. Absolutely, Your Honor. And I will get to that in the exact section of which it was in fact violated. Today's case is about defining what a state agency is and in doing so whether the shield of sovereign immunity should be extended to the University of Massachusetts Medical School. The 11th Amendment to the United States Constitution gives the state sovereign immunity from suit in federal court. So do you concede counsel that the 11th Amendment standard that we've discussed in our cases protecting states and state agencies from suit is the same definitional standard that should be applied for purposes of the sovereign immunity granted under the false claims act? Our contention is, Your Honor, that in terms of the case law here in the First Circuit, Metcalfe and Eddy and Fresnias both outline an eight-factor test. But that's in the 11th Amendment context. So you concede that that's the same test to determine whether an agency or a defendant is a state agency within the purview of the false claims act? I do concede that is the best test, yes, Your Honor. In determining whether that agency, as I've said, is a state agency entitled to 11th Amendment immunity, this court has engaged in what originally was a seven-factor test in Metcalfe and Eddy, and then further refined by the Supreme Court in Hess v. Port Authority, Trans-Hudson Court, and Aurora v. Robbins, the First Circuit's opinion written by Justice Lynch in Fresnias Medical Care to be enunciated as this eight-factor test. What is dispositive in terms of that test is whether the entity has funding over funding power to satisfy judgments without direct state participation. If the court would look at the recent court filings by UMass in relation to the Leo Volani fraud, there was an affidavit from the medical school's associate vice chancellor, James Healy, and UMass internal auditor, Kyle David, who stated that $3.8 million was turned over out of the coffers of the medical school, the business unit known as Commonwealth Medicine. Respectfully, the affidavits were dated July 29, 2015. They were turned over to Relators Council by the U.S. Attorney in November 2015 after we had filed a motion for relator's share based on the Leo Volani's fraud. It's my contention and our contention that these affidavits really do shed light on the medical school's status as an independent entity of the Commonwealth. Well, do the affidavits indicate, or does the record otherwise indicate, whether there are in fact Massachusetts appropriated funds going to the medical school in addition to whatever its other sources of income may be? The affidavits indicate a couple of things. It indicates, first of all, that Commonwealth Medicine is in fact the stated business unit of the medical school. It also indicates that the return of this $3.8 million came directly from the medical school. How did they accomplish that? Well, first of all, they have insurance, and so $700,000 worth of insurance was paid over from their private insurer to the state, to the Executive Office of Health and Human Services. They also collected an additional $1.5 million in part in the litigation that they were engaged in. UMass filed three lawsuits, and in that time period in Worcester County Superior Court and the Worcester and Probate Family Court, they were engaged in protracted litigation. I take it that none of these facts were presented to the district court? Your Honor, no, we didn't have any of these facts at the time. But, you see, that's the problem you've got. We've got to decide this case based on what was pleaded and argued in the district court. This isn't a forum where you can introduce new evidence, and you haven't moved, as far as I know, for relief from judgment or for reconsideration by the trial court. No, because this is a de novo review, my understanding is that... Well, yes, it's de novo review on the record compiled in the district court. De novo review doesn't mean you can come in here with new evidence. Right. I agree, Your Honor. Unfortunately... And, moreover, the answer, is it not, to Justice Souter's question, is that there is absolutely no question, none that I'm aware of, but that the medical school does receive information substantial appropriated funds from the legislature in Massachusetts, and has received them since its inception. Actually, Your Honor, that's not correct. Respectfully, they only receive 5% of their funding from the Commonwealth. The rest of it is gained through contracts, as the ISAs, through research, through grants. And we did  not receive any of that. But, I mean, the point, just to finish this up, is I take it there's nothing in this subsequent case of which we would be required here to take judicial notice that would have a bearing definitively in your favor. That's all I'm getting at here. I understand, Your Honor. We did, so the court is aware, we did file a motion for relater's share in this case just about two months ago. And, again, the information was new to us. It came out of the fact that there was an insolvency in the estate of Leo Volani's case. I don't want to take your time on this. I just want to make sure that there isn't something that we are charged with judicial notice of that would have a significant bearing on this case. And I think the answer is no. Okay. I guess I would respectfully disagree and say that, potentially, the court could take judicial notice of the fact that there was an insolvency in the estate of Leo Volani, who was a defendant in this case. And part of that insolvency, there was court pleadings that were, in fact, filed in some of the underlying cases, including the Worcester Superior Court and the Probate and Family Court that introduced this information, Your Honor. If you don't mind, for the last two minutes before you get to, I know you reserve time for rebuttal, but could you respond to Justice Souter's question, too, at the very beginning of your argument about whether there was an FCA, what is the theory of why there is FCA liability? Assume you're right and that we have proper defendants. How is there a claim? Because we have to reach that question, the merits of that question, at least as to some of the defendants that you're suing here, right? Absolutely, Your Honor. Yeah. So what is the... So, well, there's two ways, first of all. Under 3729A1D, Mr. Volani had possession, custody, or control of the property or money used or to be used by the government, and he knowingly delivered or caused to be delivered less than all of that money or property. How does this implicate the medical school? Because Mr. Volani was an employee who was charged with handling $59 million in checks each year. The medical school's business unit, Commonwealth Medicine, failed to implement its cash-receiving policy, allowing this six-year fraudulent scheme to take place. The medical school also approved the false and fraudulent submissions through Nancy Vassell, who's the Associate Vice Chancellor for the Administration of Finance. So each and every month that the medical school transmitted the financial reports to MassHealth, they would be submitting a false claim, and that would fall squarely under 3729A1A, B, and G. Well, they were submitting information based on facts as they understood them to be, but that is not, as I understand it, sufficient to plead a false claim. No, Your Honor, they were submitting falsified reports based on the fact that they didn't claim that the monies that they had actually received were monies that were going into UMass's bank account. Yeah, but they didn't know the reports were false. The reports were false because of embezzlement by an employee down the line. Your Honor, we don't know whether they knew they were false or not because of the fact that we haven't taken any discovery. But you have pleaded that they did know? We've pled that there's been a reckless disregard for the entire cash-receiving policy by the people that were in charge of Commonwealth Medicine, which in essence led to this fraudulent scheme that was uncovered by my client over a six-year period. So your claim is that reckless disregard for the truth can be tantamount to an intentionally false claim under the Act. My claim is, Your Honor, that since we weren't allowed to do any discovery, we don't necessarily know at this time what, for example, Nancy Bassel, the Associate Vice Chancellor, knew or didn't know about this transmittal. She had inevitably had to sign off on the transmittals that were going over. I don't know what investigation she did to understand the $3.8 million that should have been turned over to the government wasn't in fact turned over. You said there was a second theory? The first theory was under D, that A-1-A-D, that he had the money, that he retained the money, that he didn't turn it over. The second one is based on the fact that A-1-A and A-1-B talks about the actual false submissions. If you're submitting accounting reports that are in fact false, and money that should be turned over to the Commonwealth and the federal government isn't being turned over, then in fact that's a false claim. I think your time is up. You have five minutes to make a note. Mr. Mayor, could you go right to the issue that we've been discussing? I think it would be helpful to hear from you on that, about the sufficiency of the statement of a False Claims Act claim. Certainly Justice Sousa, I'm happy to start with that. I do think we move for dismissal both on the Stevens arm of the State Inquiry and in addition on the Eleventh Amendment, which is jurisdictional. We think those issues overlap. It's perfectly appropriate to decide. We think the False Claims Act statutory issue in lieu of the Eleventh Amendment, since they're I don't think the Court can avoid the Eleventh Amendment inquiry by deciding the 9-B question, because I think in that case the Court would be essentially assuming it has jurisdiction. So we think it should decide the arm of the State as a threshold issue. But let me start with the question here. The facts as pled by in the proposed complaints, paragraph 107 to 109, by Mr. Ouellette are admitted by him, and the scheme he alleged with respect to what we call the Vellani Theft, was that Mr. Vellani, that private third parties wrote checks to UMMS. And Mr. Vellani intercepted those checks before they were received by the University, endorsed those checks over to a DBA he had set up that essentially had a very misleading name to it and made it sound like it was the University, deposited those checks in his private bank account at Milford Bank, and after they cleared, withdrew the funds and used them for his purpose. Nowhere in that sequence of events is a false claim for payment submitted to any governmental entity by anyone. But not by the University, certainly, not even by Mr. Vellani. And so to this date, Your Honor, we don't believe that Mr. Ouellette has ever adequately pled any theory by which an embezzlement of funds through his diversion from the University, of which the University was a victim, in any way supports an allegation that the University submitted false claims for payment. There's a lot of talk about reports that are made for the first time in a reply brief here in this Court. They're not actually pled in either the operative complaint or in the proposed third amendment complaint. The two complaints were before the Court below. The only allegation with respect to falsified reports there related to the second theory, the cost misallocation theory. In any event, he's suing under the False Claims Act, not the False Record Keeping Act. And the applicable provision of the False Claims Act would impose liability on an entity that creates false records or statements material to a false claim. You never can avoid showing that ultimately there was a false claim for payment and there was none here. And so that disposes, we believe, of that first theory of fraud. Mr. Ouellette's counsel here does not make, didn't address at all the second theory of fraud, which was a theory that somewhat convoluted appears to be that we misallocated and misbilled costs of the Medicaid program. Under this Court's precedence in Carvelis and Roast in Duxbury, a relator who alleges that the defendant itself submitted a False Claims Act for payment, a false claim for payment, must, in order to satisfy 9b, plead specific instances of at least a representative number of specific false claims. And it's undisputed that that has not been done here. So that's really, as a threshold matter, disposes really of both theories under 9b. In addition to that failed deficiency, the complaint also does not, with any particularity at all, point to any specific cost that was misallocated, any specific item that was misbilled to the program. And that, you know, again disposes, we think, both of that alternative theory of liability here under the False Claims Act. Can I go back to the first comment that you made, which was that you think we have to address the Stevens issue, and we can't just decide the case on the FCA claim? Did I understand you to say that? Yes, you did understand. You said that's because the Stevens issue is jurisdictional? So the Stevens issue itself was a statutory interpretation of the False Claims Act. The issue which is constitutional and jurisdictional. And it justified that on the grounds that the substantive inquiry was nearly identical so that it was perfectly appropriate to decide a virtually identical statutory issue that avoided the constitutional question. But I don't know that that rationale would apply to, essentially, this court assuming it has jurisdiction over a state entity and deciding on the merits that the pleading was not adequately pledged. You know, and in addition, I would just like to go back to the other comment that you made. I'm just trying to think. There's no argument here that as to the non, I understand you think both one state, one's not, they think both are non-state. But there's clearly a non-state defendant in the case, correct? Arguably, yes. Okay. Well, I Was that not? It's very complicated. Well, can I make it more complicated? Let me point something out. This case is here on a Rule 54B certificate. That's what makes it complicated. The Rule 54B certificate is limited to the claims against University of Massachusetts Medical School. So if University of Massachusetts Medical School is a state agency, there is no non-state defendant before us right now. And Judge Sellea, that's exactly correct. Here's what makes it complicated. At the time Mr. Ouellette filed their opening brief, they were here only under Rule 54B. There was not a final judgment below. Not a final. There was not a final judgment as to all parties below. They came under Rule 54B. The reason the District Court, Judge Sellea, limited the grant to 54B to the issue of the arm of the state and not to the 9B issues implicated in the motion for leave to amend is that Mr. Villani was still a defendant in the trial court, and therefore there would be an overlap of issues between that and what was still there. Well, there was another reason, too, and that was because the plaintiff never asked for an expanded 54B certificate. There's a footnote in Judge Hillman's decision granting 54B pointing out that he's never been asked to certify the denial of the motion for leave to file a third amendment complaint. Right. And so the complicating factor is that between the time when Mr. Ouellette's opening brief was filed, which we believe prematurely addressed issues that were not certified for appeal, and the time our appellee brief was due, Mr. Villani's estate had been dismissed out and at that point there was a final judgment. And so whether that means you have a jurisdictional problem at this point or not I think is unclear because arguably at this point, as we sit here today, you had a premature notice of appeal that was filed that may, under the amended Rule 4, have subsequently essentially been cured and rendered. But if it had been cured and rendered, would that then mean we have a potentially non-state defendant before us? And if you view that as proper, would you say before us? Well, maybe I'll put it this way. If I understand you right, either we have no case at all, not because of Stevens, but because of a premature appeal, or if we have a case before us, it's a case that has both a disputed state defendant and a clearly non-state defendant. Yeah. So the first part of that only asks the individual defense. You clearly have an appeal here as to the... But I do want to quibble with one thing. To this day, Mr. Ouellette has never served any of the individual defendants. I want to make clear, I don't represent the individual defendants in their personal capacities. And so the position we've taken in our brief is this. We think Mr. Ouellette is here before the court. Some of the 9B issues that we have raised on behalf... The ones that we have raised on behalf of the university apply equally to the individual defendants. We think this court has discretion to affirm on those grounds because Mr. Ouellette is represented here in court, and to bind him to an adverse judgment Because the reason why I'm asking is I take the point about how Stevens explained why they got into the... Why they could bypass the 11th Amendment because they were deciding the same, they claimed, issue under the FCA. And you say, well, that's not the situation here if you jump to 9B. That's a step beyond. But I'm wondering what we're required to do or not in a case in which we must decide, if it were the case, the 9B issue. And if the decision of that is clearly dispositive as to the state entity, whether we're obliged to then do an arm of the state analysis at that point. I think you are, but... And the other thing I would say is I actually... I think in this case the arm of the state inquiry that you'll be avoiding is not a difficult one. And you'd be frankly potentially setting doubt on whether the University of Massachusetts is an arm of the state. And this court recognized in a number of decisions, including in Irizarry Mora, that the vast majority of state universities in this country have been deemed to be arms of the state. And it's hard to imagine if the University of Massachusetts is not an arm of the state, what university would be. Because every indication points to it being an arm of the state. It was established by the legislature. It was... The Board of Trustees that was set up is established and required to administer the university, quote, on behalf of the commonwealth. Its employees are state employees who are entitled to all the privileges of state employees. The governor appoints the Board of Trustees, a supermajority of the Board of Trustees. The chair of the board serves at the governor's pleasure. The land and property that the university has is owned in the name of the commonwealth. The university may only dispose of that property in the name of the commonwealth and subject to approvals by the governor and by the council on higher education. The attorney general of Massachusetts oversees and must approve all of its litigation. When you go through all the structural factors, they really point uniformly, we believe, to Massachusetts being an arm of the state. Am I right? It just seems like a surprising fact, given the age of the institution, that there's just no precedent addressing whether it is or is not an arm of the state. There is no federal court of appeals precedent. There are a uniform line. I mean, there's, I think, potentially 11 or 12 federal district court decisions. Uniformly, all have held it's an arm of the state. And every state court decision has held it's an arm of the state. And so, really, we don't think this is a particularly complicated question. And what this court has said is when the structural factors are indeterminate, and we don't believe they are here, then the trump card, the tie for judgment here, and here it is very clear under state law that the commonwealth would be legally on the hook in the event there's liability here. And the way the case law works is if the state is legally obligated for an entity's judgments, that entity's an arm of the state. You don't go further and ask whether in a particular case, based on what we think the likely damages amounts are, we think the entity would or would not be able to fund it out of its current cash. Spell out again for my benefit what the basis for the conclusion that they are legally, that they are liable for the judgment. Absolutely. So we cited, first of all, this controller regulations that are cited in our brief where the controller has a process by which the university can seek funding for judgments. There are, there's the big dog that didn't bark here, which is there's not a single statement anywhere by the legislature separating itself out from any of the debts of the university. And we think really the most obvious and most significant telling statement here by the commonwealth is the 1997 statute in which the commonwealth did spin out and privatize the clinical division, the hospital of the medical school. And we append that in A5 of our brief. And subsection I of that statute, the legislature said that it made a finding that it is in the fiscal interest of the commonwealth to separate the obligations and liabilities of the clinical division of the medical school from the commonwealth. And that statement makes sense only if the legislature understood that in the absence of that spin off, the obligations and liabilities of the hospital would be those of the commonwealth. And it also makes clear that the remaining divisions of the medical school that had not been spun off remain, that their liabilities remain those of the state. And so every indication here, it goes in that direction. There's been a lot of references in the reply brief to things that have been going on with the relator share and what access the medical school has to funding. I just want to say two very quick things. First of all, there are two theories of fraud plot here. One is the Belani theft of 3.8 million. The misallocated cost theory on page 15 of your opposition to dismissal below, Mr. Ouellette said that there were tens of millions of dollars allegedly of misallocated costs. Being most generous to him, tens of millions would be at minimum 20. You treble that, you're at 60. You add treble damages for the 3.8, you're at 72 million. You add civil monetary penalties and relator speeds. You can see what they're seeking below, despite this suggestion that this is only really a few million dollars. It's a substantial award that clearly would put, even if the inquiry were to speculate about the ability to pay. And finally, what I would say, which is the Supreme Court decision, and this was raised by the first time in the reply brief, which is why it's not in our brief, but the unanimous Supreme Court decision in regions of the state of California versus Doe, which is, the site for that is, excuse me, I'm sorry. It's a 1997 decision, 519 U.S. 425, and it's a unanimous decision. And what the Supreme Court says is two things. One is, the allegation there was that the state of California, Universities of California, should not be viewed as an arm of the state for that case because it had an indemnity agreement in place, which would indemnify it fully for any damages. And the Supreme Court said two things. Number one is, that the legal liability that it would be imposed on it was in and of itself sufficient. And two, that it was irrelevant for that reason, whether there would be, in fact, an indemnity agreement in place. And they specifically give us an example, the insurance. And they say, even if there was liability insurance, no one would think the existence of liability insurance. I do want to just, because one thing was said here, the insurance policy that was used here to obtain $700,000 was a first party casualty and property policy. It was a theft policy which insured the university against the theft that it had suffered. It was not a liability policy. Thank you very much. Thank you, Your Honors. The Legislative Acts of 1997 admittedly doesn't apply to the medical school's lack of corporate status, but that should not be probative because the legislature could always reserve the right to revoke all delegated powers it gave to UMass Memorial Center. Legislative enactments change by succeeding legislatures, so the comparison between the Memorial Center Hospital and the medical school, based on the 1997 Legislative Acts, shouldn't be dispositive. No, it's not dispositive, but I take it that Mr. Marin is arguing that the fact that the legislature felt that it had to spin off into a separate corporation the clinical functions in order to let those go their own way is a pretty good indication that everything that was left behind without the spin off continues to operate as a part of the state government. That's what the argument is. That's an argument, Your Honor, but the enabling legislation under Chapter 75 has over 50 different sections. If you look at the Fresnias factors, many of those are met. For example, Section 1 provides for the university to manage its own operations and to have its responsibilities, powers and duties in the management of the affairs of the university, which is not subject to or superseded by any other state agency, board, bureau, commission, department or officer. Section 3 provides that the trustees may adopt... That language you just read, any other state agency, does not indicate that the university is itself an agency? You know what, Your Honor, even though it's called a state agency, we're talking about the specific commonwealth medicine department. But there is no specific department. Commonwealth medicine is just a label. It's not a separate corporation. It's not a separate corporation. Just a unit that the medical school has and under Massachusetts law, an unincorporated subdivision of an existing entity isn't amenable to suit at all, isn't treated as a legal entity. Your Honor, according to the First Circuit's ruling in University of Rhode Island v. Chesterson, the state's formal incorporation of a state-related entity is not necessarily dispositive on the issue of its autonomy, either for immunity or diversity purposes. In that case, the URI, they appointed, for example, 10 out of 13 trustees that were appointed by the Rhode Island governor for three-year terms. Here, 16 out of 19 are appointed at UMass to serve five-year terms, and they serve without compensation. So like this court found in Chesterton, they're insulated from any economic pressure for removal. Moreover, this court observed in Fresnius that, quote, the governor's appointment power over the board is not enough in itself to establish that an entity is an arm of the state. If there is an appointment, the governor has no direct voice in the university's decision-making. That would support Factor No. 4 in Fresnius. I mean, the big issue, obviously, comes down to is whether or not the Commonwealth is a backdrop or a backstop for the lawsuits that might, in fact, come against the medical school, and albeit I understand that this court's not technically looking at this evidence of the Volani fraud, but certainly we know that they were able to pay that $3.8 million without having to affect the Commonwealth. But the fact that they can pay some judgments without calling on the state doesn't prove that they're not, that the state isn't liable for the damages. But Your Honor, what it does show is that since there's so many other sources from which the medical school can get its funding, that the Commonwealth's treasury being just 5 percent of the medical school's budget really takes it out of this idea that, in fact, it is being funded. This is in stark contrast to Irazari-Mora, where the Commonwealth provides the bulk of the funding for the university operations. More than 60 percent of UPR's funding comes from the government. So with respect to the medical school, Commonwealth Medicine, and Center for Healthcare Financing, the Commonwealth has not assumed that obligation, either directly or indirectly, since virtually all the funding needed for the operation by the medical school is raised on its own through research, through service, through programs, through contracts. But there's a comptroller rules in the mechanism. Just how does that operate, if they want to make a request to have the funds paid by the state, they can? They can. And the state has set it up so that that can be easily done? Yes, they're not involved with the day-to-day operations in terms of that. In fact, even with the annual reports that are submitted, they're submitted in a format where there's no detailed expenditures or receipts that are attached to it. So they really have financial autonomy, maybe more so than even the enabling statute says. But that's really the outcome of what this case is about. Not every state entity should be treated as a state agency. That takes away from the dignity of the Commonwealth. Thank you, Your Honor.